**In re Petition of Louis SANTORO and Carole Santoro for Visitation, Pursuant to Minnesota Statutes 257.022.**

No. C7–97–1526.

Court of Appeals of Minnesota.

May 6, 1998.

Review Granted July 16, 1998.

Carl E. Norberg, Saint Paul, for respondents Louis and Carole Santoro.

Carl A. Blondin, Oakdale, for appellants Kenneth and Stella Borgstrom.

Timothy T. Ryan, Ryan Law Firm, Chisago City, for children.

Robert G. Rancourt, Rancourt Law Offices, Lindstrom, guardian ad litem.

Considered and decided by KLAPHAKE, P.J., and RANDALL and WILLIS, JJ.

## OPINION

WILLIS, Judge.

Appellants Kenneth and Stella Borgstrom, the adoptive parents of their grandchildren, challenge the district court's grant of visitation to the children's other grandparents and assert that the grandparent visitation statute, Minn.Stat. § 257.022, subds. 1 and 3 (1996), is unconstitutional. We affirm.

## FACTS

Michael Borgstrom and Lisa Santoro Borgstrom died in a 1987 automobile accident, leaving two children, A.N.B. and N.M.B. Michael Borgstrom's parents, appellants Kenneth and Stella Borgstrom (the Borgstroms), became guardians to the children and adopted them in 1992. The children are currently 14 and 12 years old.

Lisa Borgstrom ran away from the home of her parents, respondents Carole and Louis Santoro (the Santoros), when she was 16 years old. She petitioned to be placed in foster care and told two of her foster mothers that the Santoros had physically abused her, and when she married Michael Borgstrom, she told his parents the same thing. After A.N.B. and N.M.B. were born, Lisa Borgstrom told her former foster parents and several friends that she did not want the Santoros ever to have custody of her children. But according to family photos submitted into evidence by the Santoros, Lisa Borgstrom took her children to visit the Santoros on holidays.

The parties agree that Lisa Borgstrom ceased contact with her parents in the autumn of 1986, when her younger sister left the Santoros' home to live with Lisa and Michael Borgstrom. The sister testified that Carole Santoro regularly hit her and abused her emotionally. Lisa Borgstrom had not reconciled with her parents before her death.

During the process by which the Borgstroms obtained guardianship of the children, the Santoros requested visitation. The Borgstroms, who first met the Santoros at Michael and Lisa Borgstrom's funeral, said they would allow visitation only if it were ordered by the court. Carole Santoro testified that she and her husband did not pursue the issue at the time because they could not afford a lawyer. The Santoros attempted to send the children letters, cards, and presents by certified mail, but the Borgstroms intercepted and returned most of them unopened.

In 1994, seven years after they last saw the children, the Santoros brought this action seeking visitation. The Borgstroms responded by submitting numerous affidavits regarding Lisa Borgstrom's allegations of her abuse by the Santoros. The court appointed a guardian ad litem and ordered supervised visitation on a preliminary basis. The guardian contacted the social service agency that had placed Lisa Borgstrom in foster care and learned that all related documents had been destroyed. The guardian interviewed Lisa Borgstrom's sister and the other individuals who submitted affidavits on the Borgstroms' behalf, as well as interviewing the Santoros and some of their other children, and came to "the conclusion that these are safe grandparents to have grandchildren with." In 1996, the parties stipulated to a visitation schedule and to the appointment of a neutral visitation supervisor, but when the parties were unable to agree on who the supervisor should be, the court selected a supervisor suggested by the Borgstroms' counsel.

Both the guardian ad litem and the visitation supervisor described Kenneth Borgstrom as extremely hostile and controlling. The guardian ad litem reported that the Borgstroms regularly made disparaging com-

ments about the Santoros in the children's presence. The guardian and the supervisor both reported that the children appeared to enjoy themselves during visits with the Santoros but that they began to act angry or depressed shortly before returning home; the guardian concluded that the Borgstroms' hostility made it impossible for the children to admit they enjoyed the visits. The guardian reported that A.N.B. was very interested in learning about her mother. All parties agreed that the children seemed to get along with other Santoro relatives who were present during most of the visits.

In September 1996, after ten visits, the Borgstroms cancelled a scheduled visit, telling the supervisor that N.M.B. had attempted to run away from home that morning to avoid visiting the Santoros. The Borgstroms produced A.N.B.'s written statement and N.M.B.'s affidavit, both stating that the children did not want further visitation, largely because they had their own lives to lead and resented having their schedules dictated by the court. At the guardian ad litem's suggestion, the court appointed an attorney for the children, who informed the court by letter that his clients wished to end visitation.

No visitation took place after September 1996, and in December the Borgstroms formally moved to end it. The district court held an evidentiary hearing in April 1997. One day before the hearing, the Borgstroms filed a motion raising a constitutional challenge to the grandparent visitation statute. At the hearing, the Borgstroms testified that the stress of unwanted visitation had caused family disruption and had affected the children's school performance. Through cross-examination, the Borgstroms elicited testimony that the guardian ad litem had little familiarity with the children's home and school lives. The district court allowed the guardian ad litem to offer an opinion on whether visitation would be in the best interests of the children but did not allow Lisa Borgstrom's former foster mother to offer a lay opinion.

> The court found that the Borgstroms have actively, vindictively and without reason obstructed any contact whatsoever between the Santoros and the minor children.

> * * * For no apparent reason there exists much animosity by the Borgstroms toward the Santoros * * *. Neither Kenneth Borgstrom nor Stella Borgstrom could testify as to any reason why the children should not be encouraged to visit and interact with the Santoros * * *.

The court made no mention of the abuse allegations in its findings, found the constitutional challenge to be "without merit," and ordered the guardian ad litem to prepare a visitation schedule for court approval. The court later modified the schedule on the ground that it was excessively complicated. The court denied the Borgstroms' motion for a stay of visitation pending appeal, but the children, through their attorney, informed the guardian ad litem that they "would not be exercising their visitation," prompting the guardian's resignation. We affirm the district court's judgment.

## ISSUES

1. Did the district court err in determining that Minn.Stat. § 257.022, subds. 1 and 3, are constitutional?

2. Was the district court's grant of visitation based on a misinterpretation of the 1997 amendment to the statute?

3. Did the district court abuse its discretion in (a) finding that visitation would be in the best interests of the children, (b) finding that visitation would not undermine the parent-child relationship, or (c) failing to consider properly the amount of personal contact between the grandparents and the grandchildren?

4. Did the district court impermissibly delegate judicial power by directing the guardian ad litem to draft a visitation schedule?

## ANALYSIS

This action is based on Minn.Stat. § 257.022 (1996), the relevant portions of which provide:

> Subdivision 1. **When parent is deceased.** If a parent of an unmarried minor child is deceased, the parents * * * of the deceased parent may be granted reasonable visitation rights to the unmarried minor

child during minority by the district * * * court upon finding that visitation rights would be in the best interests of the child and would not interfere with the parent[-]child relationship. The court shall consider the amount of personal contact between the parents * * * of the deceased parent and the child prior to the application.

* * * *

Subd. 3. **Exception for adopted children.** This section shall not apply if the child has been adopted by a person other than a stepparent or grandparent.

## I. Constitutionality of the Statute

[1, 2] The Borgstroms argue that section 257.022, section 1, is an unconstitutional infringement on parental rights guaranteed by the Fourteenth Amendment to the United States Constitution and that section 3, by distinguishing between grandparents and other adoptive parents, violates the Equal Protection Clause. No appellate court has ruled on the constitutionality of the statute. Courts exercise their power to declare statutes unconstitutional "with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn.1989).

### A. Parental rights under the Constitution

The United States Supreme Court has repeatedly recognized a general right to freedom from governmental interference in child-rearing decisions. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (striking zoning ordinance that prohibited grandmother from raising in same household two grandsons who were cousins) (plurality opinion); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (granting Amish parents freedom to withdraw children from public schools after eighth grade); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (striking state law prohibiting teaching of foreign languages to children). This fundamental interest in the "companionship, care, custody, and manage-

ment" of children, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), along with associated rights related to marriage and decisions about whether to bear children, has been described as "older than the Bill of Rights," *Smith v. Organization of Foster Families*, 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965)), because it derives from "the relation between individual and state * * * upon which our institutions rest." *Meyer*, 262 U.S. at 402, 43 S.Ct. at 628. In other words, as a matter of values widely shared in American society, certain forms of social engineering are beyond the power of the state. In constitutional terms, these rights are considered implicit in the Due Process Clause of the Fourteenth Amendment as a form of "liberty" that may not be infringed on without due process of law. *See Moore*, 431 U.S. at 501–02, 97 S.Ct. at 1936–37 (discussing Fourteenth Amendment derivation of child-rearing rights).

In general, deprivations of these fundamental rights are subject to strict judicial scrutiny, meaning that the state bears the burden of proving that such deprivation is narrowly tailored to a compelling state interest.[1] *Carey v. Population Servs. Int'l*, 431 U.S. 678, 688, 97 S.Ct. 2010, 2018, 52 L.Ed.2d 675 (1977). But strict scrutiny is triggered only when the deprivation is direct and substantial. *Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). Consistent with strict scrutiny, the state may invoke its power as *parens patriae* to protect children "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Yoder*, 406 U.S. at 233–34, 92 S.Ct. at 1542.

Logically, a parent's constitutional rights should include the right to exercise reasonable control over a minor child's activities and associations. A plurality of the Supreme Court appeared to endorse this view in upholding a denial of visitation to a father

---

1. Where the right to abortion is at stake, the test is somewhat different because of the unique nature of the issue. *Planned Parenthood v. Casey*,

505 U.S. 833, 852, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992).

where the child's mother was married to another man when the child was conceived, noting that the imposition of visitation would infringe on the married couple's parental rights. *Michael H. v. Gerald D.*, 491 U.S. 110, 124, 131, 109 S.Ct. 2333, 2342, 2346, 105 L.Ed.2d 91 (1989) (plurality opinion).[2]

Despite the strong language in which the Supreme Court has articulated parental rights in the upbringing of children,[3] only one state has invalidated a grandparent visitation statute on Fourteenth Amendment grounds. *Brooks v. Parkerson*, 265 Ga. 189, 454 S.E.2d 769, 773 (1995). Two states have found such statutes to violate state constitutions that provided broader guarantees of privacy than the federal constitution does. *Beagle v. Beagle*, 678 So.2d 1271, 1276 (Fla. 1996);[4] *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn.1993). Minnesota has at times also recognized broader privacy rights than the federal constitution provides, but there is no case law doing so in the area of childrearing rights. *Cf. Doe v. Gomez*, 542 N.W.2d 17, 30 (Minn.1995) (invalidating restriction, previously upheld by Supreme Court, on public funding of abortion).

■ Many of the states that have rejected constitutional challenges to grandparent visitation statutes have applied a lower standard of scrutiny after concluding that the imposition of grandparent visitation rights is not a "direct and substantial" imposition on parental rights under *Zablocki,*. 434 U.S. at 387, 98 S.Ct. at 681. *See, e.g., Sightes v. Barker*, 684 N.E.2d 224, 229–30 (Ind.App.1997); *Campbell v. Campbell*, 896 P.2d 635, 642–43 (Utah App.1995); *R.T. v. J.E.*, 277 N.J.Super. 595, 650 A.2d 13, 14–15 (Ch. Div.1994); *Herndon v. Tuhey*, 857 S.W.2d 203, 209 (Mo.1993); *see*

*also Hollingsworth v. Hollingsworth*, 34 Ohio App.3d 13, 516 N.E.2d 1250, 1254 (1986) (upholding statute on ground that it does not "unduly" intrude on parental rights). But the United States Court of Appeals for the Eighth Circuit has stated that strict scrutiny applies where a regulation "forces family choices,"· as opposed to merely "affect[ing]" or "encourag[ing]" them. *Gorrie v. Bowen*, 809 F.2d 508, 523 (8th Cir.1987). Court-ordered visitation is plainly a forced choice.

Other states have upheld their statutes based on the notion that grandparents and children share associational interests that give rise to a state interest sufficient to justify the imposition on the rights of parents. *See Ridenour v. Ridenour*, 120 N.M. 352, 901 P.2d 770, 773 (App.1995) (citing associational rights of extended family members under Fourteenth Amendment); *Michael v. Hertzler*, 900 P.2d 1144, 1150 (Wyo. 1995) (finding such rights protected under state constitution); *King v. King*, 828 S.W.2d 630, 632 (Ky.1992) (citing "fundamental" rights of grandparents without identifying their source). The Supreme Court has acknowledged that parental control rights are limited by a child's fundamental rights, as well as by the competing rights of other parents. *See, e.g., Parham v. J.R.*, 442 U.S. 584, 600–04, 99 S.Ct. 2493, 2503–05, 61 L.Ed.2d 101 (1979) (discussing due process rights of child committed to mental institution by parents); *Runyon v. McCrary*, 427 U.S. 160, 176–79, 96 S.Ct. 2586, 2597–98, 49 L.Ed.2d 415 (1976) (rejecting claim of parental right to choose racially segregated private school).

**2.** The four-Justice plurality also concluded that nothing in American tradition supported the recognition of fundamental childrearing rights of "adulterous" fathers. *Michael H.*, 491 U.S. at 126–27, 127 n. 6, 109 S.Ct. at 2344, 2344 n. 6. One Justice concurred in the judgment on the ground that the applicable state statute, while denying the appellant the opportunity to assert paternity, provided alternative grounds for the father to seek visitation and that the record supported the district court's conclusion that visitation under the statutory alternative would not be in the child's best interests. *Id.* at 132–37, 109 S.Ct. at 2347–49 (Stevens, J., concurring in judgment).

**3.** *See, e.g., Yoder*, 406 U.S. at 232, 92 S.Ct. at 1541–42 ("[t]his primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition").

**4.** The court in *Beagle* invalidated only the portion of the statute that allowed a grandparent to petition for visitation when the child's family was "intact" and did not comment on *Sketo v. Brown*, 559 So.2d 381 (Fla.App.1 Dist., 1990), a previous lower court decision sustaining the provision allowing a petition where a parent had died.

We find a rationale based on grand-parents' competing interests persuasive in light of the grounding of the parental rights doctrine in "the relation between individual and *state* * * * upon which our institutions rest." *Meyer*, 262 U.S. at 402, 43 S.Ct. at 628 (emphasis added). The primary purpose of the parental rights doctrine appears to be to limit the authority of the state to interfere in family life as a means of advancing its own interests or beliefs. But the Borgstroms do not contest the state's right to compel a custodial parent to allow visitation by a noncustodial parent, because the noncustodial parent, if he or she has demonstrated a commitment to the responsibilities of parenthood, also has fundamental childrearing rights. *See Lehr v. Robertson*, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983) (stating that fundamental right arises from demonstrated commitment rather than from biological link). We conclude that strict scrutiny does not apply when the state interferes in parental rights solely for the purpose of facilitating the exercise of the associational rights of another individual.

The next inquiry is whether the Santoros, as noncustodial grandparents, have such rights. A plurality of the Supreme Court has explicitly rejected a claim that fundamental rights inhere only in the traditional nuclear family, instead endorsing a "larger conception of family" in striking a zoning ordinance that prevented a grandmother from raising in the same home two grandsons who were cousins rather than brothers. *Moore*, 431 U.S. at 505, 97 S.Ct. at 1938–39.[5] The Court has long treated custodial relatives as equivalent to parents. *See Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (recognizing privacy rights of aunt in raising niece but concluding they were outweighed by state interest in

enforcing child labor laws). But *Lehr* indicates that custody of a child is not a necessary prerequisite to the exercise of parental rights. *See Lehr*, 463 U.S. at 261–63, 103 S.Ct. at 2993–94 (stating that unmarried father may acquire parental rights by "accept[ing] some measure of responsibility for the child's future"). Moreover, in viewing privacy rights as limitations on state power based on commonly shared values, we are satisfied that a state law restricting the right of grandparents to associate with their grandchildren—for example, a statute providing that no grandparent may visit a grandchild without first acquiring a state license—would violate "intrinsic human rights, as they have been understood in this Nation's history and tradition."[6] *Smith*, 431 U.S. at 845, 97 S.Ct. at 2110 (citation and internal quotation omitted).

We therefore conclude that the grandparent visitation statute, because it imposes on parental rights only as a means of facilitating the exercise of the associational rights of grandparents and children, need not be subject to strict judicial scrutiny. We have generally presumed that it is in the best interests of children to have contact with their relatives. *See Westphal v. Westphal*, 457 N.W.2d 226, 229 (Minn.App.1990) (concluding that mother's cutting off contact with grandparents was best interests consideration, although not evidence of endangerment for custody purposes). We further conclude that this consideration and the intrinsic value of facilitating the exercise of fundamental associational rights give rise to sufficiently important state interests to justify the statute, that the statute is substantially tailored to promoting those interests, and that section 257.022, subdivision 1, therefore does not violate privacy rights guaranteed by the Fourteenth Amendment.[7]

---

5. The Court endorsed the grandmother's privacy rights by a 4–3 vote. One Justice concurred in the judgment on zoning law grounds and another dissented on the ground that the grandmother had failed to exhaust administrative remedies.

6. One Supreme Court decision has cast parental rights as an aspect of a right to "intimate association" between individuals who "draw much of their emotional enrichment from close ties with others." *Roberts v. United States Jaycees*, 468

U.S. 609, 618–19, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984) (explaining that intimate association doctrine did not extend to Jaycees' desire to exclude women from their organization).

7. In intermediate judicial scrutiny, a statute must be "substantially" tailored to an "important" state interest. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988). We need not establish here the precise level of scrutiny applicable to a statute that imposes on

### Equal protection

■ The Borgstroms also argue that section 257.022, subdivision 3, violates the Fourteenth Amendment guarantee of equal protection by treating grandparents who adopt their grandchildren differently from other adoptive parents, whose adoption cuts off the visitation rights of the child's biological grandparents. A statutory classification that impacts the exercise of a fundamental right is reviewed similarly to a direct state imposition on the right. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (applying strict scrutiny to welfare residency requirements that effectively limited recipients' right to interstate travel). Because we have concluded that the state has sufficient interests to justify its direct imposition on parental rights with respect to grandparent visitation, the only remaining inquiry is whether the distinction between classes of adoptive parents is sufficiently tailored to promoting those interests.

■ An adoption by unrelated parties is considered to sever a child's ties to his or her birth family. *See In re Welfare of R.A.N.*, 435 N.W.2d 71, 72–73 (Minn.App.1989) (holding that father's voluntary termination of parental rights and child's subsequent adoption by unrelated party cut off paternal grandparents' visitation rights). Instead, the relatives of the adoptive parents step into the appropriate roles as relatives of the child. But where grandparents adopt a child, the child simply moves to a different location within the existing family structure, and the considerations that support continuing con-

tact between the child and his or her biological relatives remain in force. We therefore conclude that the Borgstroms are not similarly situated to unrelated adoptive parents for purposes of grandparent visitation, and that the statutory classification between grandparents and unrelated adoptive parents is therefore substantially tailored to the state's interests.[8]

### II. Interpretation of the Statute

The Borgstroms argue that the district court erred in finding that:

> The Minnesota Legislature, in the 1997 session, reinforced the public policy of encouraging visitation between children and their grandparents by amending Minn. Stat. § 257.022 to specify that grandparents have visitation privileges in their own right rather than only derivatively.

The Borgstroms are correct that subdivisions 1 and 3 of the statute, at issue in this case, were not amended in 1997.[9] Moreover, it was established well before 1997 that the statute was intended to modify the common-law rule that grandparents' only legal rights regarding their grandchildren are derivative through their children.[10] *Olson v. Olson*, 534 N.W.2d 547, 549 (Minn.1995) (citing *In re Niskanen*, 301 Minn. 53, 57, 223 N.W.2d 754, 757 (1974)).

The Borgstroms's apparent argument that grandparents still lack independent rights to visitation is based on a passage in *Olson* stating:

> Further, we agree with the New Hampshire Supreme Court which has said that

fundamental rights as a means of promoting a competing fundamental right. For purposes of this case, we apply intermediate scrutiny because it is more stringent than the alternatives.

8. We need not address here the validity of the statute's other classifications, whereby grandparents retain their right to petition for visitation with a child adopted by a stepparent but not with a child adopted by an aunt, uncle, or sibling.

9. The 1997 amendment added section 3a to the statute, which specifically grants the right to petition for visitation to a grandparent of a child adopted by a stepparent, where the grandparent's child is either deceased or lost parental rights through the stepparent adoption proceed-

ing. 1997 Minn. Laws ch. 177, § 3. The amendment codifies and extends this court's holding in *In re Adoption of A.M.R.*, 527 N.W.2d 565 (Minn. App.1995), *review denied* (Minn. Apr. 18, 1995).

10. We do not consider our holding in this case that grandparents have a fundamental right to associate with their grandchildren to be a departure from this common-law rule. As noted, privacy rights, as well as those rights explicitly guaranteed by the Fourteenth Amendment, are guarantees only against state interference. The common-law rule merely provides that the state has no affirmative duty to facilitate exercise of grandparents' fundamental associational rights absent legislative action.

what is at issue in grandparent visitation cases is "the right of the child to * * * know her grandparents," and not the interests of the grandparents.

*Olson*, 534 N.W.2d at 549 (quoting *Roberts v. Ward*, 126 N.H. 388, 493 A.2d 478, 482 (1985)) (ellipsis in original). A footnote continues:

> The statute at issue here provides to the grandparents the right to petition for visitation but we believe the legislature, by adopting the statute, intended to protect children from losing contact with their grandparents because of disputes between parents and grandparents.

*Id.* at 549 n. 3.

*Olson* does not support the proposition that grandparents' rights under the statute were derivative before the 1997 amendment, particularly in view of the fact that this court's *Olson* opinion held such rights to be derivative, and the supreme court reversed. *Olson v. Olson*, 518 N.W.2d 65, 66–67 (Minn. App.1994). The Borgstroms also appear to argue (as the children did below) that, under *Olson*, the statute creates rights enforceable by the children rather than by the grandparents. But by its terms, the statute grants to grandparents, not children, the right to petition the court to order visitation. Such a petition is necessary only where the children's custodial parents do not want visitation to occur. Placing the enforcement power in the children would be meaningless in most situations because of the control that custodial parents exercise over their children's lives.

▮ The supreme court in *Olson* concluded that, under the statute, a district court may properly grant grandparent visitation when it finds that (1) the party seeking visitation is a grandparent within the meaning of the statute, (2) visitation would be in the best interests of the child, and (3) visitation would not interfere with the parent-child relationship. *Olson*, 534 N.W.2d at 549. The district court made these findings. While the district court erred in relating the 1997 amendment to this case, we conclude that the Borgstroms have not carried their burden of demonstrating that the error was prejudicial. *See Bloom v. Hydrotherm, Inc.*, 499 N.W.2d

842, 845 (Minn.App.1993) (stating that appellants have burden on appeal to show error prejudicial), *review denied* (Minn. June 28, 1993). Where the findings necessary to a conclusion are adequately supported, a court's inclusion of other, unsupported findings is harmless error. *Hanka v. Pogatchnik*, 276 N.W.2d 633, 636 (Minn.1979).

### III. Application of the Statute

Because there is no dispute that the Santoros are grandparents within the meaning of section 257.022, subdivision 1, the two relevant issues are whether the district court properly determined that (1) visitation is in the children's best interests, and (2) visitation would not interfere with the parent-child relationship. We review these findings only for an abuse of discretion. *Olson*, 534 N.W.2d at 550.

### A. Best interests of the children

▮ A court need not make findings in support of a grant of grandparent visitation with the same degree of detail that is required in a determination of custody. *Id.* at 550 n. 5. The only best-interests factor that the court is mandated to consider is the amount of previous contact between the children and the grandparents. *See id.* at 550 (construing previous contact as best interests factor); *cf.* Minn.Stat. § 518.17, subd. 1 (Supp.1997) (listing best interests factors for custody purposes).

▮ The Borgstroms argue that the court and the guardian ad litem erroneously proceeded from a presumption that visitation with relatives is in children's best interests. But as we have noted, precedent supports this general presumption. *See Westphal*, 457 N.W.2d at 229.

#### 1. Previous contact

▮ The Borgstroms admit that the Santoros attempted to maintain contact with the children between 1987 and 1994 but that the Borgstroms prevented that contact. There is no Minnesota case law on application of the statutory "previous contact" requirement to these circumstances.

The Borgstroms argue, in effect, that the previous-contact requirement is intended to reflect "the intimacy of the relationship between each [grand]parent and the child," Minn.Stat. § 518.17, subd. 1(4), essentially considered from the child's viewpoint, and that any allocation of fault in preventing the development of a relationship is irrelevant. We recognize that the fundamental purpose of visitation is to maintain an existing relationship. *Danielson v. Danielson*, 393 N.W.2d 405, 407 (Minn.App.1986); *see also Olson*, 534 N.W.2d at 549 n. 3 (concluding that section 257.022 was "intended to protect children from losing contact with their grandparents"). But we also note that section 257.022 is likely to be invoked only in situations where a parent has cut off contact between a child and a grandparent. Accepting the Borgstroms' argument would encourage the very conduct the statute seeks to prevent.

It is undisputed that the Santoros made diligent efforts to maintain contact with the children, and it appears that the court accepted the Santoros' contention that their delay in bringing this action resulted from their inability to afford a lawyer. *Cf. In re Welfare of L.A.F.*, 546 N.W.2d 55, 59 (Minn.App.1996) (concluding that father's inability to afford attorney to handle paternity proceeding and social service agency's denial of visitation could not support finding of abandonment), *rev'd on other grounds*, 554 N.W.2d 393 (Minn.1996). We conclude that the district court properly considered the Borgstroms' conduct and the Santoros' excuse for delaying the taking of legal action as factors mitigating the absence of previous contact.

### 2. Admission of opinion evidence

■■■■ The Borgstroms argue that the district court erred in refusing to allow Lisa Borgstrom's former foster mother to offer a lay opinion as to whether visitation was in the children's best interests, while allowing the guardian ad litem to offer such an opinion. The question of whether to admit or exclude evidence is within the district court's discretion, absent erroneous interpretation of the law. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45–6 (Minn.1997). A decision on the sufficiency of the foundation for evidence is also a matter of discretion. *McKay's Family Dodge v. Hardrives, Inc.*, 480 N.W.2d 141, 147 (Minn.App.1992), *review denied* (Minn. Mar. 26, 1992). We conclude that the district court did not abuse its discretion in determining that the former foster mother, who testified that she saw the children approximately three times a year, with intervening telephone contact, did not have sufficient opportunity to observe whether the changes in the children's behavior to which she testified actually resulted from visitation with the Santoros. We also do not believe the court abused its discretion in determining that different considerations applied to the court's own appointed advocate for the children, despite evidence of deficiencies in the guardian ad litem's knowledge of the children's lives.

### 3. Other best interests factors

Reference to the best interests factors listed in Minn.Stat. § 518.17, subd. 1, although not mandated in grandparent visitation cases, is helpful in our analysis. Two statutory factors in section 518.17, subdivision 1, particularly relevant to this case are:

(2) the reasonable preference of the child, if the court deems the child to be of sufficient age to express preference;

\* \* \* \*

(12) the effect on the child of the actions of an abuser, if related to domestic abuse \* \* \* that has occurred between \* \* \* a parent and another individual \* \* \*.

Both children in this case are clearly old enough to express a preference; in custody disputes, courts have granted great deference to the preferences of children of similar ages, due in part to the dubious practicality of ordering a teenager to go where he or she does not want to go. *See Ross v. Ross*, 477 N.W.2d 753, 756–57 (Minn.App.1991) (citing cases involving children as young as 12 years old). But in the custody context, the court may take note of whether a teenager's preference appears to result from parental manipulation. *Roehrdanz v. Roehrdanz*, 438 N.W.2d 687, 690–91 (Minn.App.1989), *review denied* (Minn. June 21, 1989).

Here, the court made no findings relating to the children's preference. All the testimony available from the children indicated that they wanted to end visitation, but the guardian ad litem suggested that the children were being unduly influenced by the Borgstroms. The district court's apparent decision to believe the guardian ad litem amounts to a credibility determination, to which this court grants great deference on appeal. *Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn.1988).

The district court clearly erred in stating that the Borgstroms had initially blocked contact "without reason." The Borgstroms' belief that the Santoros had abused Lisa Borgstrom and her sister certainly appears reasonable in view of the number of people to whom Lisa Borgstrom had given similar accounts, as evidenced by the number of affidavits the Borgstroms presented. Later, however, the guardian ad litem interviewed the affiants, attempted to track the abuse allegations through social services, observed the Santoros with and without the children, and came to the conclusion that the Santoros would not present a danger to the children. The evidence could support a conclusion either that the Santoros had changed their previous behavior or that Lisa Borgstrom and her sister had exaggerated their claims, and we therefore conclude that the court did not abuse its discretion in implicitly finding that the allegations of abuse did not reflect a present threat to the children's best interests. *Cf. Gray v. Hauschildt,* 528 N.W.2d 271, 274 (Minn.App.1995) (upholding finding that grandparent visitation was in child's best interests where grandmother with history of alcoholism appeared to be maintaining sobriety).

**B. Interference with parent-child relationship**

The statutory requirement that grandparent visitation not interfere in the parent-child relationship has not been well defined by case law. The requirement was imposed in recognition of "the public policy reasons that support a denial of visitation to uphold the independence and decision-making integrity of the newly created family unit." *R.A.N.,* 435 N.W.2d at 73. The party

seeking visitation bears a "heavy" burden of proof as to this factor. *Kulla v. McNulty,* 472 N.W.2d 175, 181 (Minn.App.1991), *review denied* (Minn. Aug. 29, 1991). But by its nature, visitation against the parents' wishes undercuts parental authority to some extent and may cause discord in the home. Therefore, in reviewing for an abuse of discretion, the existence in some degree of these factors cannot be enough to reverse a district court's finding that parties seeking visitation have met their burden.

The few published opinions addressing this issue have mentioned factors such as whether the children displayed behavior problems after visits and whether the grandparents have made derogatory comments about the parents. *See, e.g., Olson,* 534 N.W.2d at 550 (noting lack of derogatory comments); *Foster on Behalf of J.B. v. Brooks,* 546 N.W.2d 52, 54 (Minn.App.1996) (citing grandmother's negative remarks in upholding restrictions on visitation); *Gray,* 528 N.W.2d at 274 (noting lack of behavior problems). Here, the guardian reported that the Santoros were careful to avoid making negative comments about the Borgstroms in the children's presence. The Borgstroms testified that the children's behavior changed because of the visits and that the children had threatened to run away because of visitation. But the guardian ad litem indicated that he considered the children's problems with visitation to result largely from the Borgstroms' pressure, and the court was within its discretion to credit this theory or simply to disbelieve the Borgstroms' account of events. *See Varner v. Varner,* 400 N.W.2d 117, 121 (Minn.App.1987) (stating that a court is not required to believe even uncontradicted testimony if there are reasonable grounds to doubt its credibility). There is no evidence that the Santoros have encouraged the children to disregard the Borgstroms' authority or have shown any disrespect for their wishes other than simply seeking contact with the children. We conclude that the district court did not abuse its discretion in finding that the Santoros had met their burden of proving that visitation would not interfere with the parent-child relationship.

## IV. Delegation of Judicial Authority

Finally, the Borgstroms argue that the district court improperly delegated a judicial function by directing the guardian ad litem to prepare a visitation schedule. But the court later modified the schedule on its own initiative. Even on the doubtful premise that the Borgstroms' claim had merit,[11] we can perceive no form of relief as to this issue that the Borgstroms could obtain. We therefore conclude that the alleged improper delegation is a moot issue. *See In re Application of Minnegasco,* 565 N.W.2d 706, 710 (Minn. 1997) (stating that an issue is moot "when, pending appeal, an event occurs that makes * * * an award of effective relief impossible").

For the reasons stated, we affirm the district court. We have some reservations regarding the relief the district court ordered; the children's resentment at being ordered to spend designated blocks of time with people who are effectively strangers is perfectly understandable given their ages, and the hostility it generates undercuts the purpose of the visitation. But we believe that a remand for further litigation in an adversarial posture would not serve the children's best interests. Rather, having established the legal rights of the parties, we conclude that if the children continue to object to the relief granted, it should be the responsibility of the Borgstroms and the Santoros, in their mutual concern for the children's well-being, to negotiate and present to the district court for approval a more workable and age-appropriate method by which the children may build a relationship with their grandparents over the remainder of their minority.

## DECISION

We conclude that the grandparent visitation statute withstands constitutional scrutiny, and we find neither a prejudicial legal error in the district court's reasoning nor an abuse of discretion in its determination that a grant of visitation is proper on the facts of this case. We therefore affirm the district court's judgment in all respects.

**Affirmed.**

---

11. The Borgstroms rely on *Vogt v. Vogt,* 455 N.W.2d 471 (Minn.1990). But the error in *Vogt* appears to be not the district court's order that court services set a visitation schedule but rather its treatment of the resulting schedule as a stipulation of the parties rather than as a recommendation requiring independent review. *Id.* at 474–75.