**In re Petition for DISCIPLINARY ACTION AGAINST Richard G. GOMSRUD, an Attorney at Law of the State of Minnesota.**

No. C2–99–742.

Supreme Court of Minnesota.

May 28, 1999.

ORDER

Carl A. Blondin, Oakdale, for appellant.

Carl E. Norberg, St. Paul, for respondent.

Timothy T. Ryan, Ryan Law Firm, Chisago City, for Children.

Janet Snider, North Branch, Guardian ad Litem for the Borgstrom Children.

Mary Catherine Lauhead, Co-Chair of Amicus Committee, Family Law Section, Michael D. Dittberner, Co-Chair Amicus Committee, St. Paul, Attorneys for Amicus Curiae Family Law Section of the Minnesota State Bar Ass'n.

Gail Chang Bohr, Executive Director, Children's Law Center of Minnesota, St. Paul, Nancy A. Wiltgen, Leonard, Street &

**In re Petition of Louis SANTORO and Carole Santoro for Visitation Pursuant to Minnesota Statute § 257.022.**

No. C7–97–1526.

Supreme Court of Minnesota.

June 3, 1999.

Deinard, Minneapolis, Attorneys for Amicus Curiae Children's Law Center of Minnesota.

John S. Garry, Asst. Atty. Gen., St. Paul, Attorney for the Solicitor General.

## OPINION

BLATZ, Chief Justice.

This appeal presents the issue of whether the trial court abused its discretion in awarding visitation to the petitioning maternal grandparents, respondents Louis and Carole Santoro, over the objections of the children and their adoptive parents, appellants Stella and Kenneth Borgstrom. The Borgstroms are also the children's paternal grandparents. The court of appeals ruled that the trial court had not abused its discretion in ordering visitation. We reverse the court of appeals and hold that the trial court abused its discretion by awarding visitation despite the children's objections and the seven-year delay between the Santoros' last contact with their grandchildren and their filing for visitation. As we do not uphold the award of visitation, we need not reach the constitutionality of Minn.Stat. § 257.022, subd. 1 (1994).

Lisa Santoro and Michael Borgstrom married in 1982. A.B. was born on March 30, 1983, and N.B. was born on December 20, 1984. On September 18, 1987, Lisa and Michael Borgstrom died in an automobile accident. The court appointed Michael Borgstrom's parents, Stella and Kenneth Borgstrom, as the children's guardians on October 28, 1987. On July 16, 1992, the Borgstroms legally adopted the children.

Prior to their daughter Lisa's death, the Santoros had a tumultuous relationship with her. When Lisa was 16 years old, she ran away from home and petitioned to be placed in foster care. After being placed in foster care, she told her foster mother that her parents had physically abused her. She later told the Borgstroms and several other people that her parents had physically abused her and that she did not want her parents to have custody of her children in the event of her death.

Although Lisa and Michael were not close to the Santoros, Lisa still took the children to visit the Santoros on holidays. However, on Thanksgiving Day in 1986, contact between Lisa and the Santoros ceased because Lisa's younger sister, Elizabeth Santoro, claimed that Carole Santoro had abused her, and Elizabeth left her parents' home to live with Lisa and Michael. Although Lisa attempted to contact her parents by phone, the Santoros severed ties with Lisa. The Santoros did not reconcile with Lisa before her death and did not have any contact with their grandchildren during this period. Because of the Santoros' rejection of Lisa, Lisa's children last saw the Santoros, prior to court-ordered visitation, in November of 1986.[1]

During the 1987 guardianship hearing for A.B. and N.B., the Santoros requested visitation. Kenneth Borgstrom told Carole Santoro that he would never allow the Santoros to see the children unless he was physically present. The Santoros claim that they did not pursue visitation at that time because they could not afford an attorney. In addition, they assert that they tried to keep in contact with the children by phone calls and monthly letters starting immediately after Lisa's and Michael's deaths. The Borgstroms contend that the Santoros did not attempt to contact the children until four years later, in April of 1991, and admit that they returned most of the Santoros' mail unopened.[2] On July 16,

---

1. The Santoros saw A.B. at Lisa and Michael's joint funeral, but there was no contact between the Santoros and their grandchild at the funeral.

2. The record shows that the Santoros began saving returned mail in April of 1992. They have no earlier record of their letters to their grandchildren.

1992, the Borgstroms legally adopted A.B. and N.B., who had been living with the Borgstroms since the deaths of their parents.

On September 26, 1994, over seven years after they had last seen their grandchildren, the Santoros filed a petition for visitation pursuant to Minn.Stat. § 257.022. The statute provides in relevant part:

> If a parent of an unmarried minor child is deceased, the parents * * * of the deceased parent may be granted reasonable visitation rights to the unmarried minor child during minority by the district * * * court upon finding that visitation rights would be in the best interests of the child and would not interfere with the parent child relationship. The court shall consider the amount of personal contact between the parents * * * of the deceased parent and the child *prior* to the application.

Minn.Stat. § 257.022, subd. 1 (emphasis added).

The trial court initially ordered supervised visitation for the Santoros on August 2, 1995, almost a year after the Santoros first filed for visitation. The court also appointed a guardian ad litem for the children and ordered the guardian ad litem to submit a thorough report on the Santoros' home environment. The court noted that the Santoros could file a petition requesting more extensive visitation after the report was filed. Although the guardian ad litem did not file a report until October 10, 1996, on May 2, 1996, the court held another hearing to determine appropriate visitation. The court filed an order setting out a supervised visitation schedule on June 26, 1996.

The Borgstroms facilitated ten visits between their children and the Santoros between August of 1995 and September of 1996. However, in September of 1996 the Borgstroms cancelled the children's scheduled visit with the Santoros after N.B. allegedly ran away to avoid visitation. Soon after, the Borgstroms produced a written statement by A.B. and an affidavit from N.B. requesting that the court stop visitation with the Santoros. In response, the trial court appointed an attorney for the children on October 29, 1996. The children's attorney submitted two letters and a Memorandum of Law on Behalf of the Children to the trial court arguing that the children did not want contact with the Santoros, that there was little indication that the guardian ad litem had taken into account the thoughts and concerns of the children in making his recommendations, and that the Santoros had not met the statutory requirements of Minn.Stat. § 257.022, subd. 1.

In light of the trouble enforcing visitation, the trial court held a hearing on April 17, 1997, to determine the appropriateness of continued forced visitation. At the hearing, both children testified that they did not want to continue court-ordered visitation with the Santoros. At the time of the hearing, A.B. was 14 years old and N.B. was 12 years old.

The guardian ad litem also testified at the hearing, stating that the Borgstroms were hostile to him, were nonsupportive of visitation, influenced the children's opinions of the Santoros by talking about them in front of the children, and coached the children to make disparaging comments about visitation. He also explained that the children did "very well" during the visits and seemed to have a good time, but that the Borgstroms' open hostility did not allow the children to admit that they enjoyed the visits. He related that two of the Santoros' three adult children told him that they left their children in the Santoros' care for overnight visits and full weekends and had "absolutely no concerns about the way the children are cared for." [3]

---

**3.** Their third adult child, Elizabeth Santoro, filed an affidavit arguing against the Santoros' petition for visitation.

The guardian ad litem concluded that the Santoros are "good people today" and that visitation would be in the best interests of the children. However, he indicated that he had little familiarity with the children's home and school lives.

After the hearing, both sides submitted written final arguments to the court. In their final argument, in addition to arguing that visitation was not in the children's best interests, the Borgstroms contested the constitutionality of Minn.Stat. § 257.022, subd. 1, on due process, privacy, and equal protection grounds. The Santoros declined to respond to this argument, deeming it frivolous.

Almost three years after the Santoros filed the petition for visitation, the trial court filed its final order. The July 25, 1997 order quickly dispensed with the Borgstroms' argument that section 257.022, subd. 1, was unconstitutional. It then found that there "had been no face-to-face contact by [the Santoros] with [A.B. or N.B.] between the time the Borgstroms were appointed guardians for the children and the time the Santoros began their pursuit of this matter," a period of seven years, but that the Santoros had sent "numerous items, letters, cards, presents, and remembrances" by registered mail that were rejected and returned by the Borgstroms. Focusing on the Borgstroms' behavior, the trial court found that the Borgstroms had "actively, vindictively and without reason obstructed any contact whatsoever between the Santoros and the minor children," and that the Borgstroms' animosity toward the Santoros was unfounded but "likely to continue to the detriment of the minor children." It concluded that visitation was in the best interests of the children and that visitation would not interfere with the parent-child relationship. The Borgstroms appealed to the court of appeals.

The court of appeals first held that the grandparent visitation statute is constitutional. *Petition of Santoro*, 578 N.W.2d 369, 376–77 (Minn.App.1998). It then ruled that the trial court had not abused its discretion in granting visitation to the Santoros, basing its decision largely on the Borgstroms' interference with contact between the Santoros and their grandchildren. *Id.* at 378–80.

We granted the Borgstroms' petition for review.

## I.

We first turn to whether the trial court abused its discretion in ordering visitation for the Santoros. *Olson v. Olson*, 534 N.W.2d 547, 550 (Minn.1995). At the outset of this inquiry, we must state that it is difficult to adjudicate with the wisdom of King Solomon when both parties are willing to split the baby. *See* I Kings 3:16–28. The emotional welfare of these children has been neglected as both parties have resolutely refused to bow to the children's desire and need for stability. This is particularly troubling given the children's sudden loss of their parents. While the alleged conduct of the Borgstroms, if true, is reprehensible, contempt sanctions and fines are more appropriate tools to punish such behavior and to deter other families from engaging in such tactics. Children should not become pawns in the wars of adults. When the law states that the best interests of children should guide the courts, then children must be the beneficiaries of justice, not the gavel pounding out the acrimony existing between adults.

To begin our analysis, we start with the relevant statute. By statute, the trial court is required to determine whether visitation is in the best interests of the child and will interfere with the parent-child relationship. Minn.Stat. § 257.022, subd. 1. In its analysis, the trial court is required to "consider the amount of personal contact between the parents * * * of the deceased parent and the child prior to the application." *Id.; see also Olson*, 534 N.W.2d at 550. An additional best interests factor is relevant in this case: "the reasonable preferences of the child, if the

court deems the child to be of sufficient age to express [a] preference." Minn.Stat. § 518.17, subd. 1(2) (1998).

While the trial court does not have to make the detailed best interest findings required in custody determinations by section 518.17, subd. 1, *see Olson*, 534 N.W.2d at 550 (distinguishing the factual findings required for visitation cases from those required for custody determinations), we are unable to determine where the trial court focused on the best interests of these children.[4] Rather, the trial court looked almost exclusively at the Borgstroms' conduct to the neglect of all other considerations, and made only conclusory statements that the children's best interests would be served by visitation. While the record is unclear as to the extent and the effects of the Borgstroms' manipulation of the two children, the amount of time that passed before the Santoros filed for visitation is undisputed. The trial court found that A.B. and N.B. had not had "face-to-face contact" with the Santoros between the time the Borgstroms were appointed as the children's guardians and the time the Santoros petitioned for visitation, a lapse of seven years.

While we have concerns about the Borgstroms' role in thwarting the Santoros' attempts to contact A.B. and N.B. in recent years, we cannot ignore the length of time the Santoros waited before filing for visitation and the lack of contact in the interim. Examination of the record shows that there was at a minimum a gap in contact of four years before letters began to be sent. This lapse in the relationship is significant, particularly in light of the clear statutory language that a trial court is to consider the amount of contact between the grandparents and grandchildren before the visitation application is made.[5]

One of the strongest justifications for grandparent visitation is to encourage the continuation of lasting bonds and a sense of security for children. However, in this case forcing visitation will only create a sense of disruption, not security, for A.B. and N.B. The trial court was obligated by statute to weigh heavily the lack of contact between the Santoros and their grandchildren prior to the Santoros' application for visitation. This statutory mandate was not followed.

Also disturbing to us is the absence of findings of fact with regard to A.B.'s and N.B.'s preferences. Trial courts have considered the preferences of children as young as 11 years old in determining visitation, *see State ex rel. Rys v. Vorlicek*, 229 Minn. 497, 40 N.W.2d 350 (1949) (respecting the wishes of 11–year–old child to remain in third party's home rather than return to father); *see also LaBelle v. LaBelle*, 296 Minn. 173, 174–76, 207 N.W.2d 291, 292–93 (1973) (crediting 13–year–old child's preference to modify placement order and grant father custody), in part because of the futility of forcing unwilling teenagers to cooperate with visitation. By now, A.B. is 16 years old and N.B. is 14 years old. The children have repeatedly indicated through their attorney and their testimony at the visitation hearing that they wish to end court-ordered visitation with the Santoros. However, the trial court's findings focused solely on the

---

4. Indeed, the Children's Law Center and the Family Law Section of the Minnesota State Bar, groups which promote the rights of children in the judicial system, both submitted amicus briefs arguing strenuously that the trial court "made no findings of fact on any relevant factor concerning [the children's] best interests."

5. In minimizing the amount of time that passed before the Santoros attempted to contact their grandchildren, the dissent gives little weight to the legislature's mandate that a court consider the amount of personal contact between the grandparents and grandchildren *prior* to the petition. While we recognize that the absence of contact between grandparents and grandchildren for an extended period of time is a critical fact in determining whether visitation is appropriate, we are not establishing a bright-line rule. Further, we recognize that a trial court may deny visitation even if a shorter period of time has lapsed if the denial of visitation is in the child's best interests.

Borgstroms' alleged manipulation of the children, and did not address the children's stated opinions. Although the children's desire not to see the Santoros may have been influenced by the Borgstroms' attitude and conduct, the trial court is not now free to disregard the children's wishes. The purpose of the grandparent visitation statute is not to punish or reward adult misbehavior but to serve children's best interests. On this record it is difficult, if not impossible, to see how anything more than an idealized notion of familial love is being served by forcing continued visitation.[6]

The grandparent visitation statute clearly requires that visitation be in the children's best interests. Given the trial court's lack of findings in support of its conclusion and the significant amount of time that transpired, during which the children had no relationship with the Santoros, we hold that the trial court abused its discretion in ordering visitation for the Santoros. As we overturn the visitation award, we need not address the constitutionality of Minn.Stat. § 257.022, subd. 1.

Reversed.

PAGE, Justice (dissenting).

I respectfully dissent. The issues presented in this case require this court to complete two tasks. First the court, consistent with Minn.Stat. § 257.022, subd. 1 (1998) and our abuse of discretion standard of review, see *Olson v. Olson*, 534 N.W.2d 547, 550 (Minn.1995), must decide this case. Second, the court's decision must give guidance to our lower courts and the practicing bar to assist them in determining what constitutes the best interests of the child in order to ensure that future grandparent visitation cases are properly decided. Unfortunately, the court's decision fails to do either. In concluding that the Santoros are not entitled to reasonable visitation with A.B. and N.B., the court gives lip service to the requirements of section 257.022, subd. 1, and then substitutes its judgment for that of the district court in order to hold that the district court abused its discretion. In the process, the court encourages those who would oppose a grandparent's visitation to engage in conduct that, under any definition, is not in the best interests of children.

As it relates to these parties, the issue is whether reasonable visitation between A.B. and N.B. and their maternal grandparents, the Santoros, is in A.B. and N.B.'s best interest. Presumably, that which is in their best interest will provide some benefit to them and that which is not will cause harm to them or have some other negative impact on them. In concluding that visitation between A.B. and N.B. and the Santoros is not in A.B. and N.B.'s best interest, the court, beyond noting that there was a seven-year period of no personal contact between the children and the Santoros, that A.B. and N.B.'s preference was not to have visitation, and the children's ages, fails to explain how visitation would harm or otherwise negatively impact A.B. and N.B.[1] Moreover, there is nothing in the record to suggest that it would.

The grandparent visitation statute requires the district court to consider the amount of personal contact between the grandparent and the child before the application for visitation in determining whether visitation is in the best interests of the

---

6. The dissent contends that in determining that visitation is not in the best interests of A.B. and N.B. we rely *only* on a seven-year gap in contact, the wishes of the adolescent children, and "certain non-specific allegations" that the Santoros abused two of their daughters. We fail to understand what more we need to rely on in order to determine that visitation will not be in these children's best interests.

1. In fact, the evidence in the record suggests that visitation would be beneficial to A.B. and N.B. For example, the guardian ad litem noted in his October 1996 report that "the children enjoy themselves in the presence of the Santoros" and that "[A.B.] has shown a deep interest in knowing about her mother when she has visited with the Santoros."

child and in determining the reasonableness of any visitation granted. *See* Minn. Stat. § 257.022, subd. 1 (stating that the district court "shall consider the amount of personal contact between the parents or grandparents of the deceased parent and the child prior to the application" and that grandparents "may be granted reasonable visitation rights"). The court, in reviewing the district court's decision in this case, merely asserts that the temporal gap in contact between A.B. and N.B. and the Santoros is too long, and therefore visitation is not in A.B. and N.B.'s best interests. Unfortunately, the court provides no analysis of how or why the gap in contact will have a negative impact or result in harm to A.B. and N.B. if visitation with the Santoros is granted. In addition, the court fails to explain what it is about the gap in contact that warrants denying visitation altogether. By this decision, the court announces a rule that any time there is a lengthy gap in contact between children and their grandparents, visitation is per se not in the children's best interest. This rule is unwarranted.

A.B. and N.B.'s preferences regarding visitation are also factors to be considered in determining whether visitation is appropriate. But their preferences should not be considered in a vacuum. Given the evidence that the district court had in front of it regarding the Borgstroms' efforts to poison A.B. and N.B.'s view of the Santoros, any preference stated by them must be considered with the Borgstroms' conduct in mind.[2] The district court conducted an in camera interview with A.B. and N.B. and apparently did just that. Given the district court's broad discretion,

it cannot be said that the district court abused its discretion in discounting A.B. and N.B.'s preferences.

Finally, the court cites A.B. and N.B.'s ages as a reason for denying the Santoros visitation. Although it is possible that their ages might present some practical problems in creating a reasonable visitation schedule, those problems, whatever they might be, do not justify a complete denial of visitation.

The real issue in this case is whether the district court abused its discretion in awarding the Santoros visitation. The district court considered A.B. and N.B.'s preferences and ages, as well as the amount of personal contact between the Santoros and the children before the Santoros made their application for visitation, in concluding that visitation was appropriate. In considering the amount of personal contact, the district court looked at the Santoros' efforts to have contact with the children after their daughter's death, and the fact that "[a]ll attempts at contact between the children and the [Santoros] were thwarted by the Borgstroms." The district court also considered the guardian ad litem's strong recommendation, made after the guardian conducted a full investigation and spent time supervising actual visits between the children and the Santoros, that visitation should be granted. As I read the record before us, it is clear to me that there is nothing in it that supports the notion that visitation between A.B. and N.B. and the Santoros should be absolutely barred as not being in A.B. and N.B.'s best interests.[3] The simple fact is that the district court did not abuse its broad dis-

2. The court contends that the Borgstroms "facilitated" ten visits between A.B. and N.B. and the Santoros. Based on the record, it is difficult for me to conceive of a less appropriate description for the Borgstroms' conduct. In fact, according to the guardian ad litem, the Borgstroms continually hindered visitation by belittling and condemning the Santoros in front of the children and by "delaying, blocking, changing and canceling visitations" arranged by the visitation supervisor.

3. In support of its conclusion that the district court abused its discretion, the court states that the district court "made only conclusory statements that the children's best interests would be served by visitation." We grant district courts broad discretion to make best interests determinations and uphold those determinations when the evidence on the record supports them. *See Olson,* 534 N.W.2d at 550.

cretion in awarding the Santoros visitation.[4]

As important, if not more important than how this case is resolved for these children and these grandparents, is the fact that today's decision by the court eviscerates the grandparent visitation statute. It does so by condoning the admittedly "reprehensible" conduct of the Borgstroms, who the district court found "actively, vindictively and without reason obstructed any contact whatsoever between the Santoros and the minor children." The court should not dismiss the importance of rewarding the Borgstroms' conduct because rewarding that conduct will have the practical effect of opening the door for all custodial parents to stand in the way of reasonable visitation by grandparents.[5] The Borgstroms' conduct provides a roadmap of how to close the door on those grandparents who, absent the obstructionist conduct of the custodial parents, would otherwise be legally entitled to visitation. By putting its stamp of approval on this conduct, the court, whether intending to or not, is sending a strong message that this type of conduct is not only in the best interests of A.B. and N.B. but also that it is in the best interests of all children involved in grandparent visitation cases. In fact, the conduct engaged in by the Borgstroms is not in any child's best interests.

ANDERSON, PAUL H., J. (dissenting).

I join in the dissent of Justice Page.

STRINGER, J. (dissenting).

I join in the dissent of Justice Page.

4. It may be that the specter of certain nonspecific allegations of abuse of Elizabeth Santoro and Lisa Borgstrom on the part of the Santoros has influenced the court's decision. The district court had before it conflicting evidence regarding allegations that the Santoros had abused two of their children; Elizabeth Santoro testified that she had been abused as a child and the Borgstroms testified that Lisa Borgstrom told them that she had been abused by her parents, but the guardian ad litem testified that he spoke to the Santoros' two other adult children, who told him that they had "absolutely no concerns about the way the children are cared for." The guardian was present during supervised visitation and reported no evidence of or concern about abuse. We give district courts broad discretion precisely because they are in the best position to determine which witnesses are credible and to weigh the evidence. *See In re D.L.*, 486 N.W.2d 375, 380 (Minn.1992) (citation omitted) (stating that "the trial court retains broad discretion because of its opportunity to observe the parties and hear the witnesses"). Furthermore, to the extent that the allegations of abuse form the basis of the court's decision to completely bar visitation, I note that reasonable visitation as permitted by section 257.022, subd. 1, can be structured in a manner that would address those concerns.

5. The court's response to this criticism is to say that this argument focuses on the behavior of the Borgstroms rather than on the best interests of A.B. and N.B. True, the analysis takes into account the actions of the Borgstroms in assessing the best interests of A.B. and N.B., but I believe it is impossible to address their best interests while ignoring the conduct of the Borgstroms.

The legislative history supports this conclusion. In discussing the factors that a district court should consider in making the best interests determination, the legislature apparently did not include a specific reference to the best interests factors from Minn.Stat. § 518.17 (1998) (listing factors to be used in custody determinations) because the courts might construe the reference as limiting a district court's inquiry to only those factors and because those factors might not be exhaustive of the types of factors that should be considered when making determinations regarding visitation. *See* Hearing on H.F. 790, H. Jud. Comm., 69th Minn. Leg., Feb. 11, 1976 (audio tape) (statement of Rep. Neil B. Dieterich).